UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. 2:17-CR-529 |
| | § | |
| ANTONIO ESCOBAR | § | |

## ORDER DENYING MOTION TO SUPPRESS

Before the Court is Defendant Antonio Escobar's motion to suppress evidence (D.E. 15). Escobar is charged by indictment (D.E. 9) with one count of possession with intent to distribute more than five kilograms of cocaine. The Government filed a response to the motion (D.E. 16), and the Court held a hearing on October 24, 2017. For the following reasons, the motion (D.E. 15) is DENIED.

## FACTS

On August 8, 2017, border patrol agents Damien Guerrero and Gregorio Reyes were manning a United States Border Patrol checkpoint on Highway 77 near Sarita, Texas. Agent Reyes was working with his canine partner, Maya.

Around 7:16 p.m., Escobar, who was driving a gold Kenworth tractor-trailer, stopped at the checkpoint. Agent Guerrero, who has approximately nine years' experience as a border patrol agent, testified that Escobar immediately seemed nervous or "antsy" when Agent Guerrero approached his truck. Asked about his cargo and destination, Escobar responded that he was bound for Oklahoma, and that he picked up his load, which he believed to be windows, in Brownsville, Texas. Agent Guerrero

thought it "very unusual" that Escobar was uncertain as to what he was hauling, which, along with Escobar's nervousness, aroused Agent Guerrero's suspicions.

Agent Guerrero then asked to see Escobar's bill of lading. According to Agent Guerrero, Escobar's hands shook as he handed over the bill of lading, parts of which were marked over with white-out and which had handwriting on the seal and a handwritten trailer number. Agent Guerrero testified that it was "very uncommon" in his experience to see white-out and handwriting on a bill of lading, and that he knew of other instances where commercial drivers carrying forged bills of lading were in fact transporting contraband or illegal aliens.[1]

Agent Guerrero then waved Agent Reyes over to the truck so that Maya could conduct a "free air" sniff around the trailer. Agent Guerrero testified that by this point (approximately 45 seconds into the stop, according to a video recording of the primary checkpoint area), he had already decided to refer Escobar to the checkpoint's secondary inspection area, whether or not Maya alerted to the trailer.

Over the next minute, Agent Guerrero accompanied Agent Reyes and Maya as they circled the trailer, but Maya did not alert. Approximately two minutes into the stop, Agent Guerrero returned to the cab and, after checking the interior to see whether anyone was hiding inside, resumed his discussion with Escobar. He asked Escobar if he would allow him to check both the tractor and the trailer. Escobar agreed, on the condition that

---

[1] The Court notes that the parties dispute the significance of the handwriting and white-out on the bill of lading. Escobar testified that in over ten years' experience as a truck driver, he had seen many bills of lading containing handwriting or white-out used to cover mistakes. Agent Guerrero admitted on cross-examination that he had never worked in the trucking industry and was unfamiliar with various types of bills of lading or the regulations governing bills of lading. Nonetheless, the Court generally credits Agent Guerrero's testimony that the handwriting and white-out on the bill of lading reinforced the suspicions already created by Escobar's nervousness and unfamiliarity with his load.

the agents provide him with documentation confirming they had opened the trailer. At that point, Agent Guerrero asked Escobar if he was a United States citizen, which he is. The initial inquiry complete, Agent Guerrero pointed Escobar to where to park in the secondary area of the checkpoint, and approximately three minutes into the stop, Escobar drove the truck to secondary.

Once the truck was in the secondary inspection area, Agent Reyes and Maya conducted a "free air" sniff around the tractor and trailer. This time, Maya alerted to the tractor cab. The ensuing search produced approximately 13 bundles of cocaine that were found under the bed in the cab of the truck. Escobar was arrested and now moves to suppress the fruits of the search.

## ANALYSIS

### A. The Detention Was Not Unlawfully Prolonged

The Fourth Amendment generally prohibits law enforcement from stopping motorists absent "individualized suspicion of wrongdoing." *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000). However, the Supreme Court has exempted immigration checkpoints from this rule because of the public interest in stemming the flow of illegal immigration and the brief, nonintrusive nature of these checkpoints. *See United States v. Martinez-Fuerte*, 428 U.S. 543, 556–58 (1976). "[T]he brevity of a valid immigration stop was a principal rationale for the Supreme Court's conclusion in *Martinez-Fuerte* that immigration checkpoints are constitutional." *United States v. Machuca-Barrera*, 261 F.3d 425, 433 (5th Cir. 2001).

Ordinarily, "[t]he permissible duration of an immigration checkpoint stop is . . . the time reasonably necessary to determine the citizenship status of the persons stopped." *Id.*; *see also id.* at 434 n.29 ("[W]hile a border patrol agent may refer a car to secondary for any reason (or no reason at all), . . . the length of the detention is still limited by the immigration-related justification for the stop."). Thus "the length of the detention, not the questions asked" determines the constitutionality of an immigration checkpoint stop. *Id.* at 432.

However, "if the initial, routine questioning generates reasonable suspicion of other criminal activity, the stop may be lengthened to accommodate its new justification." *Id.* at 434. To justify extending the stop, "officers must have a 'reasonable suspicion'— that is, 'specific and articulable facts . . . taken together with rational inferences from those facts'—that 'criminal activity [is] afoot.'" *United States v. Escamilla*, 852 F.3d 474, 480–81 (5th Cir. 2017) (quoting *Terry v. Ohio*, 392 U.S. 1, 21, 30 (1968)). In assessing reasonable suspicion, the Supreme Court has "said repeatedly that [courts] must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)).

This analysis "'is necessarily fact-specific, and factors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion.'" *United States v. Santiago*, 310 F.3d 336, 340 (5th Cir. 2002) (quoting *United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999)). "'[D]ue weight must be given . . . to the

specific reasonable inferences which [an officer] is entitled to draw from the facts in light of his experience.'" *United States v. Pack*, 612 F.3d 341, 352 (5th Cir. 2010) (quoting *Terry*, 392 U.S. at 27).

When Agent Reyes and Maya conducted the inspection in secondary that led to the discovery of the cocaine, Agent Guerrero had already determined that Escobar was a United States citizen, so the agents had fulfilled their initial purpose for stopping him. The Court holds that the continued detention was nonetheless justified based on reasonable suspicion of other criminal activity. The specific and articulable facts cumulatively giving rise to that suspicion include (1) Escobar's nervous demeanor; (2) Escobar's unfamiliarity with the contents of his trailer; and (3) the presence of white-out and handwriting on the bill of lading. *See United States v. Hipolito-Ramirez*, 657 Fed. App'x 271, 273 (5th Cir. 2016) (prolonged border stop justified by defendant's implausible story, nervousness, and presence on a known drug trafficking corridor); *see also United States v. Pauyo*, 341 Fed. App'x 955, 956 (5th Cir. 2009) (prolonged stop justified by officer's experience with commercial vehicles, the information in the log book and bills of lading, and defendant's demeanor and reluctance to answer routine questions); *United States v. Kye Soo Lee*, 898 F.2d 1034, 1040 (5th Cir. 1990) (noting "ignorance regarding the contents of the truck's cargo hold" among facts supporting reasonable suspicion to prolong stop). Thus the officers could constitutionally detain Escobar to address the new justification for the stop.

Moreover, by the time Agent Guerrero confirmed Escobar's immigration status, Escobar had already given his consent to search the truck, thereby providing an

independent reason to prolong the stop. "[T]he permissible duration of a suspicionless stop at a fixed immigration checkpoint *includes* the time necessary to 'request consent to extend the detention.'" *United States v. Jaime*, 473 F.3d 178, 183 (5th Cir. 2006) (quoting *Machuca-Barrera*, 261 F.3d at 433); *see also United States v. Garcia*, 412 Fed. App'x 693, 695 (5th Cir. 2011). Escobar consented to further inspection within three minutes of the initial seizure, which falls reasonably within the range of time the Fifth Circuit has approved for border stops. *See Machuca-Barrera*, 261 F.3d at 429–30, 435 (agent's "few questions [that] took no more than a couple minutes," including questions regarding travel plans and whether the motorists were carrying firearms or drugs, were "within the permissible duration of an immigration checkpoint stop"); *see also United States v. Brigham*, 382 F.3d 500, 511 (5th Cir. 2004) (en banc) ("There is . . . no constitutional stopwatch on traffic stops.").

Of course, once he consented, Escobar should have expected his detention to continue long enough for the search to be completed. *Machuca-Barrera*, 261 F.3d at 435 ("After [defendant] consented to a search, [agent] needed no justification to prolong the encounter."). In sum, Escobar's consent to the search, which he provided before the question of citizenship was settled and within three minutes of being stopped, provides a sufficient justification for extending the detention, independent of Agent Guerrero's reasonable suspicion.

To argue that the stop was unreasonably prolonged, Escobar relies on *Rodriguez v. United States*, 135 S. Ct. 1609 (2015), which held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's

shield against unreasonable seizures." *Id*. at 1612. Escobar urges that *Rodriguez* "should lead to a reevaluation" of prior Fifth Circuit case law affording border patrol agents "wide leeway in questioning motorists stopped at immigration checkpoints." *See* D.E. 15, p. 7 (citing *United States v. Lopez*, 428 Fed. App'x 376, 380 (5th Cir. 2011); *United States v. Hinojosa-Echavarria*, 250 Fed. App'x 109, 111 (5th Cir. 2007); and *Machuca-Barrera*, 261 F.3d at 430, 433). Thus, according to Escobar, Agent Guerrero's questioning regarding Escobar's travel plans and cargo and his request to see the bill of lading went "well past the permissible scope of an immigration inspection," thereby unconstitutionally prolonging Escobar's stop. D.E. 15, p. 8.

The Court disagrees that *Rodriguez* requires categorical reconsideration of established precedent relating to border stop searches. *Rodriguez* found constitutional error where the detaining officer lacked reasonable suspicion of possession of contraband, but nonetheless made the defendant wait seven to eight minutes after his traffic citation had been issued while a second officer was summoned to the scene. 135 S. Ct. at 1613. *Rodriguez* is distinguishable because (1) Agent Guerrero developed sufficient reasonable suspicion that Escobar was transporting contraband to continue detaining him after completing the immigration-related justification for the seizure; and (2) Escobar consented to the search in secondary within a reasonable time of being stopped.

Moreover, Agent Guerrero did not improperly delay fulfilling the initial purpose of the stop by "asking a lengthy series of questions unrelated to immigration" before asking Escobar about his citizenship. D.E. 15, p. 8. The Fifth Circuit has repeatedly

"declined to establish a set script of immigration questioning to which agents must adhere by rote, recognizing that, generally, it is the length of the detention, not the questions asked, that makes a specific stop unreasonable." *United States v. Ventura*, 447 F.3d 375, 381 (5th Cir. 2006) (citations omitted). "[U]nder *Machuca-Barrera* it is necessarily irrelevant whether a non-immigration question comes before, rather than immediately following, the completion of the immigration questions and answers, for in either event the duration of the stop is equally extended, and, if the non-immigration question and answer are asking and giving consent to search, in either event the extension of the stop's duration is permissible." *Jaime*, 473 F.3d at 185.

Contrary to Escobar's position, nothing in *Rodriguez* confines the scope of a detaining officer's discussion with a motorist to the narrow purpose for which the stop was made. *See* 135 S. Ct. at 1615 ("Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005))); *see also id*. at 1614 ("[T]he Fourth Amendment tolerate[s] certain unrelated investigations that d[o] not lengthen the roadside detention."). Thus *Rodriguez* does not disturb *Machuca-Barrera*'s holding that the constitutionality of a border stop turns on "the length of the detention, not the questions asked," and there is no need to revisit the Fifth Circuit's pre-*Rodriguez* line of border stop cases. *Machuca-Barrera*, 261 F.3d at 432. "This circuit . . . held long before *Rodriguez* that officers needed reasonable suspicion of other criminal activity to justify a stop extended past the time it took to deal with" the initial justification for the stop. *United States v. Pena-Gonzalez*, 618 Fed. App'x 195, 198 n.4 (5th Cir. 2015).

Here, Agent Guerrero's brief questioning regarding Escobar's cargo and destination, his request to see Escobar's bill of lading, his asking permission to conduct a further search in secondary, and his inquiry regarding citizenship, together lasted approximately three minutes.[2] As Agent Guerrero's actions "were reasonable, proceeded with deliberation in response to evolving conditions, and evince no purposeful or even accidental unnecessary prolongation," Escobar was not unconstitutionally seized. *Brigham*, 382 F.3d at 511.

### B. Escobar's Consent Was Valid

Escobar, proceeding on the premise that the Court will find that the stop was unconstitutionally prolonged, next argues that his consent to search the truck did not "dissipate the taint" of the initial Fourth Amendment violation. D.E. 15, p. 8. The Court has already held that Escobar's continued detention fell within the bounds of the Fourth Amendment in light of reasonable suspicion of trafficking contraband, so there was no "taint" to dissipate. *See Brigham*, 382 F.3d at 512. Nonetheless, the Court will consider the validity of Escobar's consent.

"A warrantless search by the police is invalid unless it falls within one of the narrow and well-delineated exceptions to the warrant requirement." *Flippo v. West*

---

[2] Agent Guerrero testified that he understood the purpose of the border checkpoint stop to be not just for checking immigration status, but for the general detection of illegal activity. The Court notes that this is incorrect as the Supreme Court has found the use of border checkpoints for general law enforcement to be constitutionally impermissible. *Edmond*, 531 U.S. at 37. The Fifth Circuit has held, however, that the constitutionality of a stop must be "determined by objective factors, *not* by the subjective motivation or state of mind of the specific individual officers conducting the stop and related examination or questioning on the particular occasion at issue." *Jaime*, 473 F.3d at 183. Viewed objectively, the duration of Agent Guerrero's questioning, as well as the questions themselves, do not overstep the boundaries the Fourth Amendment imposes on border checkpoint stops. As such, Agent Guerrero's subjective misunderstanding as to the constitutional justification for the border stop does not require suppression.

*Virginia*, 528 U.S. 11, 13 (1999) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)). One exception is a search conducted pursuant to consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (citing *Davis v. United States*, 328 U.S. 582, 593–94 (1946)).

"In order to satisfy the consent exception, the government must demonstrate that there was (1) effective consent, (2) given voluntarily, (3) by a party with actual or apparent authority." *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010). The Fifth Circuit has identified six factors, no one of which is dispositive, for assessing whether consent is voluntarily given:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedure; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*United States v. Tedford*, 875 F.2d 446, 451–52 (5th Cir. 1989). The Court will consider each in turn.

***The voluntariness of the defendant's custodial status.*** The parties do not dispute that Escobar was not free to leave until allowed to do so. Thus, this factor weighs in Escobar's favor.

***The presence of coercive police procedure.*** Agent Guerrero acknowledged that during the stop, he wore a uniform and badge and carried a firearm. However, "'the mere presence of armed officers does not render a situation coercive.'" *Escamilla*, 852 F.3d at 483 (quoting *United States v. Martinez*, 410 Fed. App'x 759, 764 (5th Cir. 2011)). Moreover, Escobar does not allege that any officer "threatened or yelled at [him] or

'treated him rudely.'" *United States v. Mata*, 517 F.3d 279, 291 (5th Cir. 2008). The absence of evidence of any coercive police activity weighs in favor of the Government.

***The extent and level of the defendant's cooperation with the police.*** The evidence indicates that at all times, Escobar cooperated with Agent Guerrero's inquiry by answering his questions and showing him his bill of lading. Therefore, this factor weighs in favor of the Government.

***The defendant's awareness of his right to refuse consent.*** There is no evidence that Escobar was informed of his right to refuse consent. Nonetheless, "the lack of awareness of this right does not taint the voluntariness of consent." *United States v. Lopez*, 911 F.2d 1006, 1011 (5th Cir. 1990); *see also Escamilla*, 852 F.3d at 483 ("'[T]here is no '*Miranda* requirement' attending a simple request for permission to search.'" (quoting *United States v. Arias-Robles*, 477 F.3d 245, 250 (5th Cir. 2007))). The Court finds this factor to be neutral.

***The defendant's education and intelligence.*** There was no evidence presented regarding Escobar's education and intelligence so this factor is neutral.

***The defendant's belief that no incriminating evidence will be found.*** Finally, Escobar could have reasonably believed that the search in secondary would not find any contraband. *See United States v. Olivier-Becerill*, 861 F.2d 424, 426 (5th Cir. 1988) ("[Defendant] was cooperative during the search, . . . apparently secure in the knowledge that . . . the inspection of the trunk would disclose nothing."). On the other hand, Escobar could have reasonably believed that the hidden contraband would be found when the tractor was searched. Thus, this factor is also neutral.

In sum, the Court concludes that Escobar freely and voluntarily gave his consent to search his tractor trailer.

## CONCLUSION

For the reasons set forth above, Escobar's motion to suppress (D.E. 15) is DENIED.

ORDERED this 28th day of November, 2017.

_____
NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE